AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
for the
Western District of New York

| | |
|---|---|
| United States of America<br>v.<br>**Douglas Grant Brooks**<br>*Defendant* | Case No. 15-M-1117<br><br>**(FILED UNDER SEAL)** |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

### Count 1
### (Operating an Unlicensed Money Transmitting Business)

Beginning in or before July 2014, and continuing until in or about September 2015, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, Douglas Grant Brooks, did knowingly conduct, control, manage, supervise, direct, and own all and part of a money transmitting business affecting interstate and foreign commerce, that is, a Bitcoin exchange service, which failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330 and the regulations prescribed thereunder, and otherwise involved the transportation and transmission of funds that were known to the defendant to have been derived from a criminal offense and that were intended to be used to promote and support unlawful activity, that is, the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

**All in violation of Title 18, United States Code, Section 1960.**

### Count 2
### (Money Laundering)

On or about June 9, 2015, in the Western District of New York, the defendant, Douglas Grant Brooks, with the intent to promote the carrying on of specified unlawful activity, to conceal and disguise the nature, source, and ownership of property believed to be the proceeds of specified unlawful activity, and to avoid a transaction reporting

requirement under Federal law, did knowingly conduct and attempt to conduct a financial transaction affecting interstate or foreign commerce involving property represented by a law enforcement officer to be proceeds of specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

**All in violation of Title 18, United States Code, Section 1956(a)(3).**

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

BRAD A. BRECHLER
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 6, 2015

_____
*Judge's signature*

HONORABLE JEREMIAH J. McCARTHY
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Buffalo, New York

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF ERIE     )   SS:
CITY OF BUFFALO    )

I, Brad A. Brechler, being duly sworn, deposes and states as follows:

1. I have been employed as a Special Agent with Homeland Security Investigations ("HSI"), within the United States Department of Homeland Security ("DHS") since October 2009. As a Special Agent, I am a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United Stated Code, Section 1956, et seq. and Title 18, United States Code, Section 1960, et seq. As part of my employment with HSI, I successfully completed the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Immigration and Customs Enforcement Basic School, both of which included intensive instruction with regard to Customs laws, financial crimes and drug enforcement, including the application for, and execution of, search and arrest warrants, as well as the application for criminal complaints, and other legal process. I am currently assigned to the Border Enforcement Security Taskforce (BEST) team, (hereinafter "HSI Buffalo BEST").

2. During my law enforcement career, I have participated in investigations of and received information from other law enforcement officers targeting money launderers

1

and unlicensed money transmitters who use virtual currency, specifically Bitcoin[1], to assist in the unlawful importation and distribution of contraband in the United States.

3. I have personally participated in the money laundering and unlicensed money transmitter investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, discussions with other agents of HSI and other law enforcement officials, interviews of witnesses, and my review of relevant records and reports. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by an HSI agent, law enforcement officer, or witness who had either direct or hearsay knowledge of that statement, to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among statements made by others and are stated in substance and in part unless otherwise indicated. Any interpretations or opinions rendered in this affidavit are based on my training and experience in the context of the facts of this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the offenses listed in the criminal complaint, it does not recite all evidence gathered thus far.

## Overview

4. From in or about July 2014 up to and including in or about September 2015, the defendant, Douglas Grant BROOKS, ran a Bitcoin exchange in the Buffalo, New York, area primarily using the website "LocalBitcoins" to find customers. Operating under the

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an upper case letter B) to label the protocol, software, and community, and "bitcoin" or "bitcoins" (with a lower case b) to label units of the currency and that practice is adopted here.

user name "doug.brooks", BROOKS bought and sold hundreds of thousands of dollars in bitcoins while failing to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330. BROOKS also transacted regularly with customers whom he knew or believed to be obtaining bitcoins while engaged in or for the purpose of engaging in the unlawful possession and distribution of controlled substances.

## Background of Bitcoin

5.  Based on my experience in this investigation, I know the following about Bitcoin:

a.  Bitcoin is a virtual currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operation on a decentralized, "peer-to-peer"[2] network. Bitcoin transactions are recorded on the "blockchain." The blockchain is a shared public ledger on which the entire Bitcoin network relies. All confirmed transactions are included in the blockchain. This way, Bitcoin wallets can calculate their spendable balance and new transactions can be verified to be spending bitcoins that are actually owned by the spender. The integrity and the chronological order of the blockchain are enforced with cryptography.

---

[2]  Peer-to-peer (P2P) is a decentralized communications model in which each party has the same capabilities and either party can initiate a communication session. Unlike the client/server model, in which the client makes a service request and the server fulfills the request, the P2P network model allows each node to function as both a client and server.

3

b.  Bitcoin mining is the process by which transactions are verified and added to the blockchain, and also the means through which new bitcoins are released. Individuals who run the mining software, competing against each other to set up each new block in the chain, are known as "miners." Each new block currently releases 25 bitcoins to its miner.

c.  To acquire bitcoins without mining, a user typically purchases them from a Bitcoin exchanger. Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible virtual currencies. A user will normally send or provide payment in the form of fiat or other convertible virtual currency to an exchanger, usually via wire or ACH, for the corresponding number of bitcoins based on a floating exchange rate. The exchanger, often for a commission, will attempt to broker the purchase with another user on the exchange that is trying to sell bitcoins.

d.  In order for a user to acquire bitcoins, they must be sent to the user's Bitcoin address. This address is an alphanumeric string whose use is somewhat analogous to a bank account number. The user can then conduct transactions with other Bitcoin users, by transferring bitcoins to their Bitcoin addresses, via the Internet.

e.  Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction. Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reveal any identifying information.

f.  Bitcoin is not inherently illegal and has known legitimate uses, much like cash; bitcoins, however, are also used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which they can be used anonymously, again like cash.

4

## Background of Dark Web Marketplaces

6.     The World Wide Web is divided between the Surface Web and Deep Web. The Surface Web (also called the Visible Web, Clearnet, Indexed Web, Indexable Web) is that portion of the World Wide Web that is readily available to the general public and searchable with standard web search engines (Google, Yahoo, etc.). The Deep Web, which contains the Dark Web, is the content on the World Wide Web that is not indexed by standard search engines. The Dark Web is classified as a small portion of the Deep Web that has been intentionally hidden and is inaccessible through standard web browsers. The most famous content that resides on the Dark Web is found in the TOR network.

7.     The TOR network is an anonymous network that can only be accessed with a special web browser, called the TOR browser. TOR stands for "The Onion Router," a reference to the many layers in an onion.[3] This is the portion of the World Wide Web most widely known for illicit activities because of the anonymity associated with the TOR network. The vast majority of goods for sale on Dark Web Marketplaces consist of illegal drugs, of nearly ever variety, openly advertised on the site and prominently visible. In addition to illegal drugs, Dark Web Marketplaces openly advertise child pornography, identity documents, firearms, and other contraband or regulated products. Silk Road, Silk Road 2.0, Evolution, Agora, and Nucleus are examples of Dark Web Marketplaces websites known to law enforcement that openly market illicit goods and activities. When initially

---

[3]     TOR directs Internet traffic through a free, worldwide, volunteer network consisting of more than six thousand relays to conceal a user's location and usage from anyone conducting network surveillance or traffic analysis. Using TOR makes it more difficult for Internet activity to be traced back to the user; this includes visits to Web sites, online posts, instant messages, and other communication forms.

accessing Dark Web Marketplaces, a new user often needs a referral link from a known user. This referral provides some credibility to the new user. Bitcoin is the most common and widely accepted form of payment for illicit activities on Dark Web Marketplaces.

### Regulation of Bitcoin Exchangers

8. Based on my experience in this investigation, I know the following about Bitcoin exchangers:

   a. Exchangers of virtual currency, including Bitcoin exchangers, are considered money transmitters under federal law and are subject to AML regulations if they conduct substantial business in the United States. See 31 C.F.R. § 1010.100 (ff)(5); see also Department of the Treasury Financial Crimes Enforcement, Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, FIN-2103-G001 (March 18, 2013).

   b. Specifically, federal regulations require a virtual currency exchanger to register with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") as a Money Services Business (MSB) and to develop and maintain an effective AML program. See 31 C.F.R. §§ 1022.210, 1022.380.

   c. Maintaining an effective AML program requires filing Suspicious Activity Reports with FinCEN when appropriate, including reporting substantial transactions or patterns of transactions involving the use of the MSB to facilitate criminal activity. See 31 C.F.R. § 1022.320.

   d. Maintaining an effective AML program also requires implementing effective means of verifying customer identities. See 31 C.F.R. § 1022.210 (d) (i) (A). In particular,

non-bank money services businesses must, at a minimum, verify and keep a record of the identity of any customer involved in a transmission of funds of $3,000 or more. See 31 C.F.R. §§ 1010.410, 1022.400.

## LocalBitcoins.com (LBC) Website Overview

9. Based on my experience in this investigation, I know the following about website www.localbitcoins.com (hereinafter referred to as "LBC"):

a. LBC allows users to post advertisements where they state exchange rates and payment methods for buying or selling bitcoins. Users reply to these advertisements and agree to meet the person to buy bitcoins with cash, or trade directly with online banking. Bitcoins can be placed in LBC web wallet, where a user can pay directly for bitcoin purchases.

b. LBC offers different types of trades:

i. Online trades occur online entirely through LBC's trading platform without the users ever meeting their trading partner. Escrow is automatically enabled and funded for online trades, meaning that a buyer is automatically protected by LBC's escrow system.

ii. Local trades are carried out face-to-face, and LBC's escrow system is not automatically enabled.

c. LBC is based in Helsinki, Finland. LBC reports that it has users in 246 countries and 10,416 cities.

d. LBC users have public profiles that trading partners can view. Among the information recorded on these profiles are transaction feedback.

**The LBC Bitcoin Exchanger Known As "doug.brooks"**

10. One high-feedback LBC user known as "doug.brooks" began operating a Bitcoin exchange service on the site in or about September 2013, selling and buying bitcoins in exchange for United States currency. "doug.brooks" advertised his service directly on LBC, as exemplified by the following post from February 11, 2015:

> "I'm a local Buffalo Bitcoin dude, trying to make it easy for anyone to get coins.
> It is as easy as meeting at a coffee shop and sitting down for 5 minutes.
> Contact hours: Anytime, contact me, and when we will set something up. Usually same day.
> Meeting preferences: Anywhere public, N Buff / Elmwood area. Let me know if we need to work things out location wise.
> Text: (813) 702-3472"[4]

11. Based on subpoena and search warrant results, I learned that the user of telephone number (813) 702-3472 is the defendant, Douglas Grant BROOKS, with email address douglasgbrooks@gmail.com. Based on undercover transactions conducted in this investigation and review of search warrant results, I know that a typical Bitcoin purchase from BROOKS worked as follows:

a. The customer would contact BROOKS through either LBC message or via text message requesting to buy a certain amount of bitcoins.

b. BROOKS and the customer would negotiate price and BROOKS's fee/commission based off the method of payment for the bitcoin (cash, bank deposit, GreenDot MoneyPak, PayPal, etc.). BROOKS typically charged a 10 percent fee.[5]

---

[4] Unless otherwise noted, quotations from electronic communications contained herein are reproduced as they appear in the original. Errors in spelling and punctuation have not been corrected.

[5] Legitimate exchanges typically charge fees of one percent or less. BROOKS's high fee implies a premium for additional anonymity in acquiring bitcoins.

8

    c.    Upon payment, BROOKS would send bitcoins to a Bitcoin address provided by the customer.

    12.    BROOKS's electronic communications between July 14, 2014, and June 18, 2015, revealed that, during this period, BROOKS conducted and negotiated to conduct transactions totaling approximately **1336.338339** bitcoins received, **1231.239159** bitcoins transferred, **$484,684.01** received, and **$371,159.77** transferred.[6] These bitcoin and dollar amounts are deduced from messages showing that BROOKS bought or sold bitcoins through both conventional and unconventional banking institutions, met with an undercover agent and received cash, transferred bitcoins to a Bitcoin address, or arranged a transaction and either bought or sold bitcoins for cash. Due to the inherent anonymous nature of Bitcoin, not every negotiated transaction could be confirmed as consummated. There are additional limitations to interpreting the search warrant results, including in the fact that some message conversations do not show the full transaction (for example, they may show BROOKS receiving a payment of $5,000 for bitcoins, but they may not show how many bitcoins BROOKS transferred in exchange). Therefore, the above recited figures likely do not reflect the full volume of BROOKS's business.

    13.    In February and October of 2015, I conducted searches for BROOKS on FinCEN's MSB Registrant Search webpage with negative results. This webpage contains

---

[6] In addition to reviewing the electronic communications, I have also reviewed records related to Douglas BROOKS from various bank and other financial institutions. Where possible, I confirmed the transactions in the messages with transactions recorded by the institutions. But in order to not double-count any transactions, only the search warrant results were used to estimate the volume of BROOKS's Bitcoin money services business.

9

entities that have registered as Money Services Businesses pursuant to the BSA regulations at 31 C.F.R. § 1022.380(a)(f). Among other requirements, individuals acting as MSBs must register with FinCEN. BROOKS has not registered as an MSB with FinCEN.

### General Knowledge of Illegal Proceeds

14. Electronic communications show that BROOKS knew or believed his Bitcoin customers to be engaged in drug trafficking or use, and that their Bitcoin transactions with him were related to such unlawful activity. The following two sets of conversations illustrate this knowledge.

15. This exchange of messages between July 14, and July 19, 2014, with SUBJECT-1[7] exemplifies BROOKS's knowledge and use of Dark Web Marketplaces in the purchase and distribution of illegal drugs using bitcoins:

    a.    SUBJECT-1: "Do you know any legit site on the deepweb where you can use bitcoins and they provide you service? If you don't mind to answer, thanks"

    b.    BROOKS: "Yeah, they have a lot of good reading on http://www.reddit.com/r/darknetmarkets, read up about pgp encryption while you are there. We can talk more in person also."

    c.    BROOKS: "absolutely. are you looking for green[8]? I can help you out."

    d.    SUBJECT-1: "Wait, is that the only thing you can get on those marketplaces or there are more stuff besides green?"

---

[7] Messages show that, on July 14, 2014, BROOKS provided SUBJECT-1 bitcoins for cash after meeting at a coffee shop, in Buffalo, NY.

[8] "Green" refers to marijuana.

    e.    BROOKS: "They have everything you could want hahah. some stuff isnt priced as nice as others. but yeah. whatever you are after."

    f.    SUBJECT-1: "I wanna make some money you know like everyone else lol, but green is not my thing, even though I know lot of people that like that, I thing I should take a"

    g.    BROOKS: "well what is your thing? molly[9]? coke[10]? xanax[11]? speed[12]? lol it is all there."

    h.    BROOKS: "its all legit, vendors[13] have reviews, it is like ebay or amazon. not really a big deal once you get to it."

    i.    SUBJECT-1: "I see, sounds good, what is the name of the website?"

    j.    BROOKS: "Agora market is good."

    k.    BROOKS: "go on agora and find a reputable vendor with high feedback, the vendors get ripped off way more than customers do. just dont release coin until you have product, that simple."

    l.    SUBJECT-1: "Well what about coke is there any good vendor you know?"

    m.    SUBJECT-1: "And I'm gonna need a referral link"

    n.    BROOKS: "http://agorahooawayyfoe.onion/register/BJwZ9pE3Cx"

---

[9] "Molly" refers to MDMA (3,4-methylenedioxy-methamphetamine), popularly known as ecstasy. MDMA, is a synthetic, psychoactive drug that has similarities to both the stimulant amphetamine and the hallucinogen mescaline.

[10] "Coke" refers to cocaine.

[11] "Xanax" (alprazolam) is a benzodiazepine. Alprazolam affects chemicals in the brain that may become unbalanced and cause anxiety.

[12] "Speed" refers to amphetamines.

[13] "Vendor" refers to the illicit goods distributor on Dark Web Marketplaces.

16. Messages revealed BROOKS's knowledge that the bitcoins purchased by BROOKS (which he re-sells) originate from individuals using Dark Web Marketplaces to distribute illegal drugs. Messages also show BROOKS's avoidance of identification documents to operate his unlawful money services business. An example of this knowledge is in a March 23, 2015, conversation with SUBJECT-2:

a. SUBJECT-2: "Do you need to go the tax paperwork/ID route?"

b. BROOKS: "No"

c. SUBJECT-2: "Good to know, cause that would be the end of our potential trading. How can i help you feel secure and safe with me as a new trade partner?"

d. SUBJECT-2: "Do you understand why more btc[14] are being sold on the westcoast, than the eastcoast?"

e. BROOKS: "Multiple reasons I figure. But yeah. More miners out there and bitcoin generating business."

f. SUBJECT-2: "By bitcoin generating businesses, do you imply mmj[15] as theres more of that here than there?, hence the higher demand for btc there(:"

g. SUBJECT-2: "many i purchase btc from have a similar farmer nature to them with dirt under their finger nails, just saying. I can just connect the dots is all."

h. BROOKS: "Yeah. The biggest dark net vendors are connected to mmj, so they need to get their btc changed into usd somehow."

i. BROOKS: "Most are probably selling on dark net markets and then looking for places to get rid of all the coin. I only have a few miners who sell to me."

---

[14]   "btc" refers to Bitcoin or bitcoins.

[15]   "mmj" refers to medical marijuana.

## CUSTOMER-1

17.     Through the course of the investigation, I have learned that CUSTOMER-1 was a distributor of high-grade marijuana in the Buffalo, New York, area and purchased over $100,000 in bitcoins from BROOKS starting in July 2014.  CUSTOMER-1 transacted with BROOKS approximately three or four times a month, in amounts of up to $5,400 each time. The following is an example of some of the electronic communications between BROOKS and CUSTOMER-1 in November 2014 where CUSTOMER-1 ultimately received 12.7 bitcoins for $4883, as confirmed by my review of the blockchain:

a.     CUSTOMER-1: "Hey man it's alright I'm lookin for 2300 worth please today would be great or tomorrow whatever works for you"

b.     BROOKS: "Just to confirm, you need 2300 worth of btc, or"

c.     BROOKS: "I have it for you. Send me your wallet and I will xfer it now."

d.     CUSTOMER-1: "6.3 Btc please"

e.     BROOKS: "I'm ordering 25btc today, and as soon and I get it, I will send you them coin. Should be in 2 hours."

f.     CUSTOMER-1: "Awesome thanks 6.5 please. keep me updated"

g.     BROOKS: "Coin has been sent. It will be 2451.41, 2450 is fine."

h.     CUSTOMER-1: "Do you have more coin"

i.     BROOKS: "Nice, another 6.2? I can do that, yeah"

j.     BROOKS: "I just need to get this 6.2 into the right account and then I can head over. Should be like 1.5h. The total for that would be $2433"

k.     BROOKS: "6.2 sent. heading to the car now. see you soon."

13

18. In addition, the conversations and messages show that BROOKS was involved in marijuana use and distribution and also knew CUSTOMER-1's involvement in marijuana use and distribution in the Buffalo, New York, area. The following is an example of this knowledge in a January 3, 2015, exchange with CUSTOMER-1:

   a. BROOKS: "Sup man. I'm having a get together and I'm short on trees[16] and my usual people are away. You know of anyone around me? Disregard if that question sketches you out hahah"

   b. CUSTOMER-1: "Hey man just saw that text still need some help?"

   c. BROOKS: "Yeah I'm still looking."

19. BROOKS even sold or offered to sell marijuana to CUSTOMER-1, according to this March 8, 2015, exchange:

   a. BROOKS: "Not a problem. I grabbed a problem pound for I think a decent price, and wanted to get rid of some of it if you were interested lol"

   b. CUSTOMER-1: "How much would like half or quarter[17] be"

   c. BROOKS: "It's nice. Blue dream[18]. I can swing by with some tomorrow. I have no idea about fair pricing. But it was 3k for the pound."

20. In September 2015, the United States Postal Inspection Service seized two (2) packages destined for CUSTOMER-1 that each contained approximately one pound of an

---

[16]   "Trees" refers to marijuana.

[17]   "Half or quarter" refer to a half or quarter pound.

[18]   "Blue dream" is a strain of exotic marijuana.

14

exotic strain of marijuana shipped from California. After arrest, CUSTOMER-1 admitted to using bitcoins to purchase the marijuana on Agora.

### CUSTOMER-2

21.  I have reviewed over 230 messages between BROOKS and CUSTOMER-2 between February 7, 2015 and March 23, 2015. The messages show that, during this period, CUSTOMER-2 bought approximately 91 bitcoins from BROOKS, paid BROOKS approximately $30,297.64, and lived at an apartment complex at or near the North Campus of the University of Buffalo. For reasons specified below in Paragraph 22(d)(iv), I believe that CUSTOMER-2 was a marijuana distributor and that BROOKS knew this.

### HSI UNDERCOVER AGENT (UCA)

22.  An HSI UCA, in four transactions, purchased 78.27095 bitcoins for $21,000 from BROOKS. The UCA initially contacted BROOKS through LBC and subsequently corresponded primarily with BROOKS via text message. All four of the meetings took place at a coffee shop in Buffalo, New York. The following is a breakdown of the recorded meetings and certain information obtained during each transaction:

  a.  February 26, 2015, purchase of 1.89495 bitcoins for $500:

   i.  BROOKS told UCA that BROOKS charges 10 percent above actual bitcoin market rate.

   ii.  UCA told BROOKS that his/her vendor used to take Western Union but now wants bitcoins. When the UCA asked BROOKS about paying for orders through TOR, BROOKS explained the logistics of vendors accepting such payment.

15

    b.    March 04, 2015, purchase of 8 bitcoins for $2,500:

        i.    UCA stated that he/she uses "Agora"; BROOKS stated that he was not familiar with it. The UCA replied that it replaced "Silk Road." BROOKS stated, "I tend not to get involved in that stuff too much."[19]

    c.    April 6, 2015, purchase of 44 bitcoins for $12,000:

        i.    BROOKS stated, "We're not doing anything wrong, it's not illegal to buy bitcoins. Well, the only thing we should be doing paperwork, but that's just between you and me."

    d.    June 9, 2015, purchase of 24.376 bitcoins for $6,000:

        i.    BROOKS stated that the maximum amount of bitcoins he could do would be $20,000, because that's the most he would buy from his source at one time.

        ii.    The UCA asked BROOKS if he was looking for people to buy bitcoins from and that the UCA had a contact who asked the UCA about purchasing large amounts of bitcoins above what the UCA needed. BROOKS was asked if he wanted his number passed to the contact. BROOKS stated "I would, I would yeah. Is it a local person?"

        iii.    The UCA stated that he/she has purchased "coke" from him for two years but in the summer months, when the college kids leave, the festival crowds want "weed"[20] and "molly," so the UCA is switching up from what he/she buys during the winter. The UCA also told BROOKS that he/she "was excited to get this summer order in" for the music crowd.

---

[19]    Note, from BROOKS's conversation with SUBJECT-1 as described in Paragraph 15 above, referring SUBJECT-1 to Agora for narcotics, that BROOKS was actually quite familiar and involved with Agora.

[20]    "Weed" refers to marijuana.

      iv.    BROOKS stated that he just started working with a college kid he would meet at Sweet Home who used to have "pounds and pounds of weed all over the place." The UCA stated that's what the college kids want. BROOKS replied "No they all want oil[21], he was the oil guy, cuz he was making it and like that was very, very, very, popular, because that's hard to get for a lot of people if they're not on the marketplaces."

**WHEREFORE,** based upon the foregoing probable cause and the ongoing and covert nature of the investigation, it is requested that a criminal complaint and arrest warrant issue under seal.

_____
BRAD A. BRECHLER
Special Agent
Homeland Security Investigations

Subscribed and sworn to before

me this 6TH day of November, 2015

_____
HONORABLE JEREMIAH J. McCARTHY
United States Magistrate Judge

---

[21]    "Oil" refers to hash oil, extracted from cannabis plants. Oil typically has a higher concentration of tetrahydrocannabinol (THC), the main psychoactive chemical in marijuana.

17